IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

KEITH Y. ARAKAKI,

      Plaintiff,

    vs.

MEGAN J. BRENNAN, Postmaster
General; UNITED STATES
POSTAL SERVICE,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 15-00229 HG-RLP


**ORDER GRANTING DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT (ECF NO. 29)**

Plaintiff Keith Y. Arakaki filed a Complaint alleging

claims of discrimination and retaliation in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*,

against his employer, the United States Postal Service and

Postmaster General Megan J. Brennan.

Defendants moved for summary judgment as to each of

Plaintiff's claims.

Plaintiff withdrew his discrimination claims.

Plaintiff opposes summary judgment on his claim alleging

unlawful retaliation.

Defendants' Amended Motion for Summary Judgment (ECF No.

29) is **GRANTED**.

## PROCEDURAL HISTORY

On June 15, 2015, Plaintiff Keith Y. Arakaki ("Plaintiff") filed a Complaint against Defendants United States Postal Service and Postmaster General Megan J. Brennan (collectively, "Defendants"). (ECF No. 1).

On October 12, 2016, Defendants filed an amended MOTION FOR SUMMARY JUDGMENT (ECF No. 29), MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (ECF No. 29-1), and DEFENDANTS' CONCISE STATEMENT OF FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 30).

On October 24, 2016, Plaintiff filed PLAINTIFF KEITH Y. ARAKAKI'S EX-PARTE MOTION TO EXTEND DEADLINE TO FILE OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, FILED OCTOBER 12, 2016. (ECF No. 32).

On October 25, 2016, the Court filed a Minute Order granting Plaintiff's motion for extension of time to file his Opposition. (ECF No. 33).

On November 23, 2016, Plaintiff filed PLAINTIFF KEITH Y. ARAKAKI'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 35) and PLAINTIFF KEITH Y. ARAKAKI'S CONCISE

STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR

SUMMARY JUDGMENT, FILED OCTOBER 12, 2016 (ECF No. 36).

On December 13, 2016, Defendants filed their REPLY

MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT.

(ECF No. 37).

On January 17, 2017, the Court held a hearing on

Defendants' Amended Motion for Summary Judgment. (ECF No.

44).

## BACKGROUND

**Plaintiff's Employment with the United States Postal Service**

In August 2002, Plaintiff Keith Y. Arakaki ("Plaintiff"),

an Okinawan male, began his employment with Defendant United

States Postal Service ("Postal Service"). (Declaration of

Keith Arakaki ("Arakaki Decl.") at ¶ 1, attached to Pla.'s

Concise Statement of Facts ("CSF"), ECF No. 36-1).

Beginning in 2010, Plaintiff worked as a Supervisor of

Maintenance Operations at the Postal Service's Processing

Distribution Center in Honolulu, Hawaii. (Id. at ¶¶ 1; 3).

Plaintiff was assigned to the second of three shifts, which

started at 6:00 a.m. and ended at 2:30 p.m. (Id. at ¶ 1).

In April 2014, Bonnie Tomooka ("Tomooka"), a Manager of

Maintenance Operations, was assigned to the second shift.

(Declaration of Bonnie Tomooka ("Tomooka Decl.") at ¶ 3,
attached to Defs. CSF, ECF No. 30-1).  With the transfer,
Tomooka became Plaintiff's immediate supervisor.  (Id. at ¶ 3;
Arakaki Decl. at ¶ 4).  From May 2014 through September 2014,
Tomooka also held supervisory responsibilities for the first
and third shifts, as she was the Manager of Maintenance
Operations of the three shifts during that period.
(Declaration of Gaylen Yonamine ("Yonamine Decl.") at ¶ 2,
Defs. CSF, ECF No. 30-3).

       According to Tomooka, she neither worked nor had any
significant interaction with Plaintiff prior to becoming his
immediate supervisor.  (Tomooka Decl. at ¶ 3, ECF No. 30-1).
Plaintiff disputes Tomooka's assertion, stating that he had
worked and interacted with Tomooka prior to her transfer to
the second shift.  (Arakaki Decl. at ¶ 2, ECF No. 36-1).

       Plaintiff claims that Tomooka disliked him prior to
becoming his supervisor.  Plaintiff also claims that in April
2012, Tomooka's supervisor,  Gaylen Yonamine ("Yonamine") told
him that Tomooka may be "going after" or "gunning after" him
when she becomes his supervisor, and that Plaintiff should
inform Yonamine if such behavior arose.  (Arakaki Decl. at ¶
5, ECF No. 36-1; EEO Investigative Affidavit of Gaylen
Yonamine ("Yonamine EEO Affidavit") at p. 23, attached as Ex.

2 to Pla.'s CSF, ECF No. 36-4).  Yonamine indicates that he communicated his concern because Tomooka disapproved of Plaintiff's friendship with another employee.  (Id. at p. 23).

**Tomooka's Planned Rotation of Maintenance Supervisors**

In early May 2014, Tomooka proposed a plan to temporarily rotate all supervisors who had worked on only one shift to another shift for a period two to three months.  Tomooka indicates that the plan arose from her observation that there was a lack of teamwork and cohesion between the three shifts, as employees failed to grasp the different responsibilities associated with each shift.  (Tomooka Decl. at ¶ 15, ECF No. 30-1).  Tomooka informed Yonamine and Chuck Lum ("Lum"), the local union president who also served as the Postal Service's acting Human Resources Manager, of her plan.  Both Yonamine and Lum approved the plan.  (Yonamine Decl. at ¶ 4, ECF No. 30-3; Lum Decl. at ¶ 9, ECF No. 30-2; Tomooka Decl. at ¶ 16, ECF No. 30-1).

Tomooka's rotation plan involved four Supervisors of Maintenance Operations, including Plaintiff.  (Tomooka Decl. at ¶ 20, ECF No. 30-1).  Tomooka sought to reassign Plaintiff from the second shift to the third shift, which began at 2:00 p.m. and ended at 10:30 p.m.  Gordon Yoshimura, a Supervisor

5

of Maintenance Operations who was regularly assigned to the third shift, was scheduled to switch positions with Plaintiff on May 10, 2014. (Id. at ¶ 17).

Shortly after learning of Tomooka's plan and before May 10, 2014, Plaintiff informed her that he would be unable to move to the third shift because of family care concerns. (Id. at ¶ 18). Tomooka responded by delaying the effective date of Plaintiff's shift change to August 2, 2014, and advancing the effective dates of two other Supervisors of Maintenance Operations' shift changes from August 2, 2014 to May 10, 2014. (Id. at ¶ 18).

**Plaintiff's Complaint About Tomooka**

Plaintiff alleges that on May 20, 2014, he overheard co-workers stating that Tomooka was trying to get him terminated from the Postal Service. (Arakaki Decl. at ¶ 24, ECF No. 36-1). Plaintiff shortly thereafter complained of the conversation, and Yonamine set up an informal mediation involving himself, Plaintiff, and Tomooka. The mediation occurred on May 23, 2014, during which Tomooka denied making any of the statements Plaintiff attributed to her. (Tomooka EEO Investigative Affidavit at pp. 2-3, Ex. 1 of Pla. CSF, ECF No. 36-3). At the mediation, Plaintiff also complained of Tomooka's plan to temporarily reassign him to the third shift.

6

(Id. at p. 3). Plaintiff asked Yonamine to pursue the Initial
Management Inquiry Process ("IMIP"), which is an internal
procedure designed to resolve workplace conflicts. (Arakaki
Decl. at ¶ 10, ECF No. 36-1). Plaintiff subsequently sent an
IMIP request via e-mail to Lum. (Lum Decl. at ¶ 3, ECF No.
30-2).

**The Initial Management Inquiry Process**

On June 4, 2014, Lum met with Plaintiff and Tomooka
pursuant to Plaintiff's IMIP request. (Arakaki Decl. at ¶ 12,
ECF No. 36-1). Tomooka again denied stating that she was
trying to get Plaintiff fired from the Postal Service. (Id.
at ¶ 13; Lum Decl. at ¶ 5, ECF No. 30-2; Ex. G of Pla. CSF,
ECF No. 30-14). Lum attests that both Plaintiff and Tomooka
indicated that they had met prior to speaking with him to
resolve the issue. (Lum Decl. at ¶ 6, ECF No. 30-2). Tomooka
attests that Plaintiff told her "that he could work with me,
and I understood the matter to be resolved." (Tomooka Decl.
at ¶ 7, ECF No. 30-1). Lum concluded that no further action
was necessary. (Lum Decl. at ¶ 6, ECF No. 30-2).

**Plaintiff's Assignment to Work on July 4, 2014**

During the week of June 21-27, 2014, Tomooka held a

staffing meeting with the three Supervisors of Maintenance
Operations who were regularly assigned to the second shift,
including Plaintiff.  The purpose of the meeting was to
determine which of the three Supervisors of Maintenance
Operations would work on July 4, 2014, a federal holiday.
(Tomooka Decl. at ¶ 9, ECF No. 30-1).  The second shift
operates with reduced staffing on federal holidays, but one
Supervisor of Maintenance Operations is required to work on
those days.  (Id. at ¶ 8).

Tomooka states that at least one Supervisor of
Maintenance Operations typically volunteers to work on a
federal holiday, as he or she would earn either additional pay
or annual leave.  (Id. at ¶ 9).  At the meeting, however, none
of the three Supervisors of Maintenance Operations volunteered
to work on July 4, 2014.  (Id.)  Tomooka then selected
Plaintiff to work on July 4, 2014.  According to Tomooka,
Plaintiff was chosen because he worked on the fewest number of
holidays over the past ten holidays and had the lowest
seniority of the three second-shift Supervisors of Maintenance
Operations.  (Id. at ¶ 10).  Tomooka states that the
methodology she used to pick Plaintiff was her usual practice.
(Id.)

Plaintiff does not dispute that he was the least senior

and had worked the fewest number of holidays among the three
Supervisors of Maintenance Operations, but indicates that when
Tomooka previously worked as the Manager of Maintenance
Operations for the first and third shifts, she worked as a
stand-in during the holidays when no Supervisor of Maintenance
Operations was available. (Arakaki Decl. at ¶ 15, ECF No. 36-
1). After Tomooka announced her decision to schedule Plaintiff
to work on July 4, 2014, Plaintiff submitted a request to use
his annual leave on July 3, 2014, and a separate request to
earn annual leave in lieu of holiday pay for July 4, 2014.
Tomooka approved both requests. (Leave Request Form, Ex. A of
Defs. CSF, ECF No. 30-8; Tomooka Decl. at ¶ 11, ECF No. 30-
1).

**Tomooka's Implementation of the Temporary Shift Rotation**

On July 8, 2014, Tomooka emailed the four SMOs who were
subject to the temporary tour change (Teranishi, Yoshimura,
Kanana, and Plaintiff) reminding them that the initial two
SMOs would return to the original tours on August 1, 2014 and
the next two supervisors would swap tours from August 2, 2014
to October 31, 2014. (Ex. C of Defs. CSF at p. 1, ECF No. 30-
10).

Between July 8, 2014 and July 17, 2014, Plaintiff asked

that his regular day-off schedule be carried over to his third
shift assignment. (Tomooka Decl. at ¶ 20, ECF No. 30-1).
Plaintiff's regular days off during the second shift were
Saturday and Sunday. (Id.) On July 17, 2014, Tomooka
responded that Plaintiff would not be able to keep his regular
day-off schedule, as the other Supervisor of Maintenance
Operations for the third shift's days-off were Sunday and
Monday, and at least one Supervisor of Maintenance Operations
was needed to work during the third shift on Sundays. (Id.;
Ex. C of Defs. CSF at p. 1). Tomooka offered to work in
Plaintiff's place for some of the Sundays on which he was
scheduled to work, and asked Plaintiff to provide her with the
dates he would require an accommodation. (Ex. C of Defs. CSF
at p. 2).

On July 23, 2014, Plaintiff responded by listing 21 work
dates for which he sought accommodation for the period between
August 2, 2014, and October 31, 2014. (Id. at p. 5).
Plaintiff also indicated "[t]here might be some other day(s)
that I cannot foresee at this time." (Id.) On the same date,
July 23, 2014, Tomooka replied to Plaintiff's request. She
stated that while she would be able to work in his place for
the first two Sundays of his new shift assignment, she would
be unable to accommodate him on the remaining requested dates.

10

(Id. at p. 6).  Tomooka instructed Plaintiff to submit leave requests for the remaining dates, which would be approved subject to the Postal Service's staffing needs.  (Id.) Plaintiff responded by expressing his dissatisfaction with Tomooka's response, stating that the arrangement caused him significant hardship.  (Id. at p. 9).  Plaintiff did not accept Tomooka's offer to work in his place for the first two Sundays of his new shift assignment.  (Id. at p. 13).

**Plaintiff's Application for a Promotion**

On July 27, 2014, Plaintiff applied for a promotion to become a Manager of Maintenance Operations.  (Arakaki Decl. at ¶ 25, ECF 36-1; Manager of Maintenance Operations posting, Ex. E of Defs. CSF, ECF No. 30-12).

**Plaintiff's Long-Term Absence from Work**

On August 1, 2014, the day before his scheduled temporary reassignment to the third shift, Plaintiff informed Tomooka via e-mail that he was feeling ill.  (Tomooka Decl. at ¶ 27, ECF No. 30-1).  Plaintiff left work on the same day and did not return until June 29, 2015.  (Id. at ¶¶ 24; 30).

On August 5, 2014, Plaintiff submitted documentation concerning his absence to the Human Resources Department but

did not provide that same information to Tomooka.  (Id. at ¶
28; Arakaki Decl. at ¶ 28, ECF No. 36-1).

**Plaintiff's Formal Complaint**

On August 6, 2014, Plaintiff filed a formal Equal
Employment Opportunity complaint.  (Arakaki Decl. at ¶ 7, ECF
No. 36-1).  Plaintiff's declaration, while difficult to
understand, appears to indicate that the formal complaint's
allegations concerned the alleged May 20, 2014 conversation he
stated he overheard, Tomooka's act of assigning him to work on
July 4, 2014, and Tomooka's act of temporarily reassigning
Plaintiff to the third shift.  (Id.)

**Tomooka's Absence Inquiry Letter**

Tomooka attests that given the extended duration of
Plaintiff's absence, she sent an absence inquiry letter to him
on August 19, 2014.  (Tomooka Decl. at ¶ 28, ECF No. 30-1).
The letter stated that pursuant to Postal Service employment
procedures, Plaintiff must produce, within five days of
receipt of the letter, "medical documentation or other
acceptable evidence of incapacity to work."  (Ex. D of Defs.
CSF at p. 1, ECF No. 30-11).  The letter advised Plaintiff of
his rights pursuant to the Family and Medical Leave Act, 29

12

U.S.C. 2601, *et seq.*, and provided detailed instructions concerning the information that must be provided in cases of extended absences from work. (Id.)

Plaintiff states that Tomooka's August 19, 2014 letter "forced me to make an emergency appointment with my physician on August 27, 2014." Plaintiff subsequently submitted a physician's note to Tomooka, as well as the documentation he previously provided to the Human Resources department on August 5, 2014. (Arakaki Decl. at ¶ 28, ECF No. 36-1). Plaintiff also requested to use accrued leave during his absence from work. (Id. at ¶¶ 28; 30). Tomooka accepted the request and approved Plaintiff's absence. (Tomooka Decl. at ¶¶ 29-30, ECF No. 30-1).

**Denial of Promotion**

The Manager of Maintenance Operations promotion to which Plaintiff applied on July 27, 2014 was a competitive position; 15 Postal Service employees submitted applications. (Yonamine Decl. at ¶ 7, ECF No. 30-3). To evaluate the applicants for the position, the Human Resources department selected a review board comprised of three senior Postal Service employees: Daniel Hirai ("Hirai"), Risa McDowell ("McDowell"), and Milton Kokubun ("Kokubun"). (Id. at ¶ 7). McDowell and Kokubun were

not aware of Plaintiff's internal complaints during their tenure on the review board.  (McDowell Decl. at ¶ 7, ECF No. 30-5; Kokubun Decl. at ¶ 7, ECF No. 30-6, attached to Defs. CSF).  Hirai attests that "whether the applicant had made a prior complaint to the Equal Employment Office is generally not known by the review board, and plays no role in this process."  (Hirai Decl. at ¶ 10, attached to Defs. CSF, ECF No. 30-4).

Hirai, McDowell, and Kokubun each ranked the individual applicants according to the their qualifications.  (Id. at ¶ 6).  An applicant's qualifications were assessed through a review of his or her responses to the job posting's descriptions of the Knowledge, Skills, and Abilities ("KSA") that were desired for the position.  (Id.)  Hirai, McDowell, and Kokubun then met to create a consensus score for each applicant's KSA, which formed the basis of a total score calculation.  (Id. at ¶¶ 7-8; KSA Matrix, Ex. F of Defs. CSF, ECF No. 30-13).  The review board then ranked the relative total scores of the applicants.  (Id. at ¶ 9).

Yonamine instructed the review board to provide him with the names of the top four applicants.  (Id.)  Plaintiff was not among the top four applicants; at least six other applicants received higher total scores than Plaintiff.  (Ex.

14

F of Defs. CSF at p. 3). Plaintiff did not obtain the promotion to the Manager of Maintenance Operations position.

**Plaintiff's Return to Work**

Plaintiff states that upon his return to work in June 2015, no desk was provided for him. Plaintiff also states that his regular computer, which he says he could recognize from its serial number, "disappeared." (Arakaki Decl. at ¶ 33).

Plaintiff also indicates that an unspecified time after he returned to work, Tomooka asked to meet with him to discuss his work performance. (Id. at ¶ 34, ECF No. 36-1). Plaintiff states that upon hearing this request, he repeatedly insisted that he was not comfortable meeting her without the presence of a union representative as a witness. (Id.) Plaintiff alleges that Tomooka was unhappy about Plaintiff's position and subsequently suspended him for a day. (Id.)

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To defeat summary judgment there must be sufficient evidence that a reasonable jury could return a verdict for the nonmoving

party. <u>Nidds v. Schindler Elevator Corp.</u>, 113 F.3d 912, 916 (9th Cir. 1997).

The moving party has the initial burden of "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The moving party, however, has no burden to negate or disprove matters on which the opponent will have the burden of proof at trial. The moving party need not produce any evidence at all on matters for which it does not have the burden of proof. <u>Celotex</u>, 477 U.S. at 325. The moving party must show, however, that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. That burden is met by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. <u>Id.</u>

If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of probative evidence tending to support its legal theory. <u>Commodity Futures Trading Comm'n v. Savage</u>, 611 F.2d 270, 282 (9th Cir. 1979). The opposing party must present

16

admissible evidence showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); <u>Brinson v. Linda Rose Joint Venture</u>, 53 F.3d 1044, 1049 (9th Cir. 1995). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Nidds</u>, 113 F.3d at 916 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986)).

The court views the facts in the light most favorable to the non-moving party. <u>State Farm Fire & Casualty Co. v. Martin</u>, 872 F.2d 319, 320 (9th Cir. 1989). Opposition evidence may consist of declarations, admissions, evidence obtained through discovery, and matters judicially noticed. Fed. R. Civ. P. 56(c); <u>Celotex</u>, 477 U.S. at 324. The opposing party cannot, however, stand on its pleadings or simply assert that it will be able to discredit the movant's evidence at trial. Fed. R. Civ. P. 56(e); <u>T.W. Elec. Serv.</u>, 809 F.2d at 630. The opposing party cannot rest on mere allegations or denials. Fed. R. Civ. P. 56(e); <u>Gasaway v. Northwestern Mut. Life Ins. Co.</u>, 26 F.3d 957, 959-60 (9th Cir. 1994). When the non-moving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact. <u>Hansen v. United States</u>, 7 F.3d 137, 138 (9th Cir.

1993); see also National Steel Corp. v. Golden Eagle Ins. Co.,
121 F.3d 496, 502 (9th Cir. 1997).

## ANALYSIS

### I. PLAINTIFF'S EMPLOYMENT DISCRIMINATION CLAIMS

On June 15, 2015, Plaintiff Keith Y. Arakaki
("Plaintiff") filed his Complaint, in which he alleges claims
for employment discrimination on the basis of his race and
sex, and retaliation for reporting the alleged discriminatory
conduct, in violation of Title VII of the Civil Rights Act of
1964 ("Title VII"), 42 U.S.C. §2000e et seq. (ECF No. 1).

On October 12, 2016, Defendants United States Postal
Service ("the Postal Service") and Postmaster General Megan J.
Brennan (collectively, "Defendants") filed an amended Motion
for Summary Judgment as to each of the claims in Plaintiff's
Complaint. (ECF No. 29).

In his Opposition, Plaintiff concedes that he cannot
support his employment discrimination claims. (Pla. Opp. at
p. 1, ECF No. 35). Plaintiff's Opposition does not argue
against Defendants' motion for summary judgment as to the
employment discrimination claims.

The Court finds that Plaintiff has withdrawn his
employment discrimination claims.

Defendants' amended Motion for Summary Judgment as to
Plaintiff's employment discrimination claims is **GRANTED**.

## II. PLAINTIFF'S RETALIATION CLAIMS

Title VII prohibits employers from retaliating against
employees who have "opposed, complained of, or sought remedies
for, unlawful workplace discrimination." <u>Univ. of Texas Sw.
Med. Ctr. v. Nassar</u>, 133 S.Ct. 2517, 2522 (2013); 42 U.S.C.
§2000e-3(a).  Title VII's protections apply to employees of
the Postal Service.  42 U.S.C. § 2000e-16; <u>Ray v. Henderson</u>,
217 F.3d 1234, 1240 (9th Cir. 2000).

Courts analyze Title VII retaliation cases by applying
the burden-shifting framework of <u>McDonnell Douglas Corp. v.
Green</u>, 411 U.S. 792 (1973).  <u>Dawson v. Entek Int'l</u>, 630 F.3d
928, 936 (9th Cir. 2011).

Under the <u>McDonnell Douglas</u> framework, the plaintiff is
first required to establish a *prima facie* case of retaliation.
<u>Id.</u>  If the plaintiff successfully establishes a *prima facie*
case, the burden shifts to the defendant to offer a
legitimate, non-discriminatory reason for its actions.  <u>Id.</u>
If the defendant satisfies its burden of showing a legitimate,
non-discriminatory reason, the burden then shifts back to the
plaintiff to prove that the legitimate, non-discriminatory

19

reason offered by the defendant was not the employer's true reason, but was a pretext for impermissible discrimination. Id.

**Prima Facie Case of Retaliation**

To establish a prima facie case of retaliation, Plaintiff must demonstrate that:

(1)  He engaged in a protected activity;

(2)  Defendants subjected him to an adverse employment action; and

(3)  a causal link existed between the protected activity and the adverse employment action.

Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1197 (9th Cir. 2003).

The Supreme Court has recognized that a plaintiff alleging unlawful retaliation pursuant to Title VII must establish "but-for" causation, meaning the employee must demonstrated that he would not have suffered the adverse employment action but for his engagement in protected activity.  Nassar, 133 S.Ct. at 2533.  But-for causation may be shown through direct and circumstantial evidence.  Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

**A.  Engagement in Protected Activity**

A Postal Service employee must pursue internal
administrative remedies, including making an informal
complaint for counseling and filing a formal administrative
complaint, before bringing a Title VII action in federal
court. <u>Sommatino v. United States</u>, 255 F.3d 704, 707-08 (9th
Cir. 2001) (citing 29 C.F.R. § 1614.105 (concerning informal
counseling) and 29 C.F.R. § 1614.106 (concerning formal
complaints)). The initiation of the administrative remedy
process within the Postal Service constitutes protected
activity under Title VII. <u>Gomez v. U.S. Postal Serv.</u>, 32 F.
App'x 889, 892 (9th Cir. 2002).

Between May 20, 2014, and May 23, 2014, Plaintiff
complained that he overheard co-workers stating that his
supervisor, Bonnie Tomooka ("Tomooka"), "was trying to get
[Plaintiff] fired." (Arakaki Decl. at ¶ 24, ECF No. 36-1).
In response to the complaint Tomooka's supervisor, Gaylen
Yonamine ("Yonamine"), held an informal mediation with
Plaintiff and Tomooka on May 23, 2014. (Tomooka EEO
Investigative Affidavit at p. 2, Ex. 1 of Pla. CSF, ECF No.
36-3). At the mediation, Plaintiff verbally requested an
Initial Management Inquiry Process ("IMIP"), which is an
internal procedure designed to resolve workplace conflicts.

(Arakaki Decl. at ¶ 10).  Plaintiff subsequently filed a formal Equal Employment Opportunity complaint with the Postal Service on August 6, 2014.  (Id. at ¶ 7).

Plaintiff began engaging in protected activity when he made the informal complaint about Tomooka between May 20 and May 23, 2014.  Gomez, 32 F. App'x at 892; see also Kraus v. Presidio Trust Facilities Div./Residential Mgmt. Branch, 572 F.3d 1039, 1044-46 (9th Cir. 2009) (broadly interpreting the internal complaint requirement to include contacts with any agency official logically connected with the process of handling discrimination complaints).

## B. Adverse Employment Action

The appellate courts have adopted a relatively expansive view of the types of conduct that qualify as adverse employment actions.  See Pardi v. Kaiser Found. Hosps., 389 F.3d 840, 850 (9th Cir. 2004).  An adverse employment action is generally considered to be any act that would dissuade a reasonable worker from making or supporting a charge of discrimination.  Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Despite the broad scope of the definition, the United States Supreme Court has emphasized that "petty slights, minor

annoyances, and simple lack of good manners" do not constitute adverse employment actions. Id. Rather, the appellate courts generally consider more significant acts, such as termination, dissemination of a negative employment reference, issuance of an undeserved performance review, and refusal to consider a plaintiff for a promotion, as the type of conduct that would dissuade a reasonable worker from making or supporting a charge of discrimination. See Brooks v. City of San Mateo, 229 F.3d 917, 928-30 (9th Cir. 2000).

Plaintiff claims he was subjected to adverse employment actions in seven separate instances.

### 1. Conclusion of the IMIP Investigation

Plaintiff faults Chuck Lum ("Lum"), the Postal Services' acting Human Resources Manager, for terminating the investigation of Plaintiff's complaint concerning Tomooka's alleged statement that she would try to get Plaintiff fired.

Plaintiff has provided no evidence that Lum's decision to cease the IMIP investigation qualifies as the type of conduct that would dissuade a reasonable worker from making or supporting a charge of discrimination. Upon receiving the IMIP investigation request, Lum proceeded to interview both Plaintiff and Tomooka. (Arakaki Decl. at ¶ 12, ECF No. 36-1).

At the meeting, Tomooka denied stating that she was trying to get Plaintiff fired from the Postal Service. (Id. at ¶ 13; Lum Decl. at ¶ 5, ECF No. 30-2; Ex. G of Pla. CSF, ECF No. 30-14). Lum attests that both Plaintiff and Tomooka indicated that they had met prior to speaking with him to resolve the issue. (Lum Decl. at ¶ 6, ECF No. 30-2). Tomooka asserts that Plaintiff told her "that he could work with me, and I understood the matter to be resolved." (Tomooka Decl. at ¶ 7, ECF No. 30-1). Lum states that as a result of Plaintiff and Tomooka's indications that the conflict had been resolved, no further action was necessary. (Lum Decl. at ¶ 6).

Plaintiff suffered no injury or harm as a result of Lum's decision to cease the IMIP investigation. See Burlington N. and Santa Fe Ry. Co., 548 U.S. at 67 (holding that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm"). He was able to, and did in fact, continue the internal complaint process by filing a formal Equal Employment Opportunity charge with the Postal Service, which Plaintiff concedes was accepted for further investigation. (Arakaki Decl. at ¶ 7, ECF No. 36-1). Lum's decision to conclude his investigation did not constitute adverse employment action. See Swindle v. Jefferson Cnty. Comm'n, 593 F. App'x 919, 927-

29 (11th Cir. 2014) (holding that the manner of the employer's investigation into the plaintiff's complaint was not considered to have a tangible, negative effect on her employment).

Even if Lum's decision to cease the IMIP investigation did constitute an adverse action, Defendants have offered a legitimate non-discriminatory reason for the action. <u>Davis v. Team Elec. Co.</u>, 520 F.3d 1080, 1089 (9th Cir. 2008). Defendants posit that Lum concluded the IMIP investigation after interviewing both Plaintiff and Tomooka and understanding that they met prior to speaking with him to resolve the issue. (Lum Decl. at ¶ 6). Lum believed that further investigation would be unwarranted in light of his interviews with Tomooka and Plaintiff and the "he said, she said situation." (Lum EEO Investigative Affidavit, Ex. 3 of Pla. CSF, ECF No. 36-5).

Plaintiff offers no direct or specific and substantial circumstantial evidence that shows Lum's reason for discontinuing the IMIP investigation to be pretextual. Plaintiff's conclusory allegation that "[b]ecause of my prior EEO case against Bonnie Tomooka, Chuck Lum didn't want to take action or be any part of this" is insufficient to show pretext. (Arakaki Decl. at ¶ 14). <u>Cafasso, U.S. ex rel</u>, 637

F.3d at 1060-61.

The evidence presented establishes that even if Plaintiff could establish a *prima facie* case of retaliation based on Lum's conclusion of the IMIP investigation, he has failed to show that Defendants' proffered explanation for Lum's decision to conclude the investigation was pretextual. <u>France v. Johnson</u>, 795 F.3d 1170, 1175 (9th Cir. 2015).

## 2. Assignment to Work on July 4, 2014

Plaintiff asserts that Tomooka's decision to assign him to work on July 4, 2014 over his objection constituted adverse employment action.

During the week of June 21-27, 2014, Tomooka held a staffing meeting with the three Supervisors of Maintenance Operations who were regularly assigned to the second shift, including Plaintiff. At the meeting, Tomooka asked for a volunteer to work on July 4, 2014, a federal holiday on which the Postal Service continues operations. (Tomooka Decl. at ¶¶ 8-9). Unlike prior instances, none of the three Supervisors of Maintenance Operations volunteered. (<u>Id.</u> at ¶ 9). Tomooka then selected Plaintiff to work on July 4, 2014.

The Ninth Circuit Court of Appeals has recognized that schedule changes may constitute adverse employment actions for

the purposes of the Title VII *prima facie* case analysis.  Ray,
217 F.3d at 1243; see also Camper v. Potter, No. CV07-
2251PHX-GMS, 2010 WL 1742537, at *2 (D. Ariz. Apr. 29, 2010)
(postal service's act of modifying employee's days-off was
considered to be an adverse employment action).

The United States Supreme Court has recognized, however,
that a plaintiff alleging unlawful retaliation must establish
causation by demonstrating that "but-for" his engagement in
the protected activity, he would not have suffered the adverse
employment action.  Nassar, 133 S.Ct. at 2533.

Plaintiff engaged in a protected activity between May 20,
2014 and May 23, 2014, when he made an internal complaint
against Tomooka.  In the week of June 21-27, 2014,
approximately 30 days after Plaintiff made his internal
complaint and Tomooka learned of the complaint, she assigned
him to work on July 4, 2014, over his objection.  (Tomooka
Decl. at ¶¶ 9-15).

Plaintiff attempts to rely on temporal proximity alone to
establish a *prima facie* case of retaliation.  Villiarimo v.
Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002)
(finding that a district court *may* infer causation when an
adverse employment action occurs "fairly soon after the
employee's protected expression.").  While the Ninth Circuit

Court of Appeals has not defined the specific parameters to infer temporal proximity, the appellate court has recently recognized three months as too remote, Serlin v. Alexander Dawson Sch., LLC, 656 F. App'x 853, 856 (9th Cir. 2016), and 36 days as sufficiently close in time, to warrant the inference. See Bagley v. Bel-Aire Mech. Inc., 647 F. App'x 797, 800 (9th Cir. 2016).

Plaintiff's only other supporting evidence is found in his declaration, in which he alleges that in the past, while she worked on *different* shifts, Tomooka worked as a stand-in during the holidays when no Supervisor of Maintenance Operations was available. (Arakaki Decl. at ¶ 15).

Plaintiff's evidence concerning causation is scant, "even given the low threshold of evidence required" to establish a *prima facie* case. Villiarimo, 281 F.3d at 1062. The Court finds that the record does not support a finding of but-for causation as required pursuant to Nassar, 133 S.Ct. at 2533.

Even if Plaintiff had demonstrated causation, Defendants have provided a legitimate, non-discriminatory reason explaining Tomooka's decision to pick Plaintiff to work on July 4, 2014.

The Parties agree that the second shift operates with reduced staffing on federal holidays, but one Supervisor of

Maintenance Operations is required to work on those days.
(Tomooka Decl. at ¶ 8).  Tomooka held a meeting during the
week of June 21-27, 2014 to discuss which of three Supervisors
of Maintenance Operations regularly assigned to the second
shift, including Plaintiff, would work on July 4, 2014.  (Id.
at ¶ 9).

According to Defendants, one or more Supervisors of
Maintenance Operations typically volunteers to work on a
federal holiday, as he or she would earn either additional pay
or annual leave.  (Id.)  At the meeting, however, none of the
three Supervisors of Maintenance Operations volunteered to
work on July 4, 2014.  (Id.)

Defendants state that Tomooka selected Plaintiff to work
on July 4, 2014, as he (1) was the least senior of the three
Supervisors of Maintenance Operations who were regularly
assigned to the second shift, and (2) had previously worked
the fewest number of holidays over the last ten holidays.
(Id. at ¶¶ 8-10).  Tomooka attests that the methodology used
to select Plaintiff was her usual practice.  (Id. at ¶ 10).
Defendants provided a legitimate, non-discriminatory reason as
to why Tomooka chose Plaintiff to work on July 4, 2014.
Davis, 520 F.3d at 1089.

Plaintiff does not dispute that he was the least senior

of the three Supervisors of Maintenance Operations, nor does

he disagree with Tomooka's assertion that he worked the fewest

number of holidays among the three Supervisors of Maintenance

Operations. Plaintiff instead argues that when Tomooka

previously acted as the Manager of Maintenance Operations for

the first and third shifts, she worked as a stand-in during

the holidays when no Supervisor of Maintenance Operations was

available. (Arakaki Decl. at ¶ 15).

Plaintiff's declaration fails to show that Defendants'

proffered explanation was pretextual. The mere fact that

Tomooka may have previously offered to work in the place of

employees who did not wish to work in the past does not

discredit Defendants' explanation as to why Tomooka picked

Plaintiff to work on July 4, 2014. France, 795 F.3d at 1175.

Plaintiff's claim based on his assignment to work on July 4,

2014 fails.

### 3. Temporary Reassignment to the Third Shift

Plaintiff claims that Tomooka's plan to temporarily re-

assign him to work during the third shift was also an adverse

employment action.

In early May 2014, Tomooka proposed a plan to temporarily

rotate all supervisors who had worked only on one shift to

another shift for two to three months in order to remedy a lack of teamwork and cohesion between the shifts. (Tomooka Decl. at ¶ 15).

Tomooka's rotation plan involved four Supervisors of Maintenance Operations, including Plaintiff. (Id. at ¶ 20). Tomooka sought to reassign Plaintiff from the second shift to the third shift, which began at 2:00 p.m. and ended at 10:30 p.m.

Shortly after learning of the Tomooka's plan and before May 10, 2014, Plaintiff informed her that he would be unable to move to the third shift because of family care concerns. (Id. at ¶ 18). Tomooka responded by delaying the effective date of Plaintiff's shift change to August 2, 2014, and advancing the effective dates of two other Supervisors of Maintenance Operations' shift changes from August 2, 2014 to May 10, 2014. (Id.)

On July 8, 2014, Tomooka sent an e-mail to all the Supervisors of Maintenance Operations about the temporary re-assignment to different shifts. (Id. at ¶ 19). In the e-mail, Tomooka reminded Plaintiff that beginning August 2, 2014, he would be swapping positions with the regularly-assigned Supervisor of Maintenance Operations for the third shift. (Ex. C of Defs. CSF at p. 1, ECF No. 30-10).

Plaintiff never worked on the third shift, as he went on an extended leave of absence beginning August 1, 2014, the day before his scheduled temporary reassignment to the third shift. (Tomooka Decl. at ¶¶ 24; 27; 30).

A *prima facie* case of retaliation can only exist if the defendant was aware that the plaintiff had engaged in protected activity when the defendant caused the plaintiff some adverse employment action.  Thomas v. City of Beaverton, 379 F.3d 802, 812 n. 4 (9th Cir. 2004); Raad, 323 F.3d at 1197.

The evidence presented establishes that in early May 2014, Tomooka proposed a plan to temporarily rotate all supervisors who had worked only on one shift to another shift for two to three months.  (Tomooka Decl. at ¶ 15).  Tomooka informed Yonamine and Lum of her plan.  Both Yonamine and Lum approved the plan and confirmed its compliance with applicable labor agreements and workplace policies.  (Yonamine Decl. at ¶ 4; Lum Decl. at ¶ 9; Tomooka Decl. at ¶ 16).  The rotation plan involved Plaintiff and three other Supervisors of Maintenance Operations.  (Tomooka Decl. at ¶ 20).  Tomooka originally scheduled Plaintiff to move from the second shift to the third shift on May 10, 2014, until Plaintiff's objection precipitated her to accommodate him by delaying the

effective date of the shift change until August 2, 2014.  (<u>Id.</u> at ¶¶ 17-18).

Tomooka learned of Plaintiff's internal complaint against her on May 23, 2014.  (Tomooka EEO Investigative Affidavit at p. 3, Ex. 1 of Pla. CSF).  The gap in time between Tomooka's decision to reassign Plaintiff to the third shift and Tomooka's awareness of Plaintiff's internal complaint is fatal to Plaintiff's claim that the reassignment was an act of retaliation.  <u>Brooks v. Capistrano Unified Sch. Dist.</u>, 1 F.Supp.3d 1029, 1037 (C.D. Cal. 2014) (observing that "[i]n general, if the decision maker does not have knowledge of the plaintiff's protected activity, there can be no retaliation for engaging in that activity").  The fact that Tomooka delayed, but still intended on implementing, Plaintiff's shift change after she knew of his protected activity does not justify a causal inference; Tomooka conceived of the plan before Plaintiff made his internal complaint.  <u>Cheeks v. Gen. Dynamics</u>, 22 F.Supp.3d 1015, 1036 (D. Ariz. 2014).  Plaintiff has failed to show a causal link between his protected activity and Tomooka's decision to reassign to the third shift.

Even if Plaintiff was able to establish causation, Defendants provided a legitimate, non-discriminatory motive

for the temporary shift reassignment.

Defendants assert that Tomooka's decision to move
Plaintiff to the third shift was part of a larger plan to
address a lack of teamwork and cohesion among Postal Service
workers, as employees failed to grasp the different
responsibilities associated with each shift. (Tomooka Decl. at
¶ 15). Significantly, there is no dispute that Tomooka
decided to conduct the shift change in early May 2014, before
Plaintiff engaged in a protected activity. Defendants
underscore that Plaintiff was not the only Supervisor of
Maintenance Operations affected by Tomooka's plan; Tomooka
scheduled three other Supervisors of Maintenance Operations to
temporarily change their shifts as well. (Id. at ¶ 20).

Plaintiff states that one of the Supervisors of
Maintenance Operations affected, Gordon Yoshimura, had prior
experience working on the second shift before being
temporarily transferred there. (Arakaki Decl. at ¶ 17).
Plaintiff also indicates that none of the other three
Supervisors of Maintenance Operations who were subject to the
shift change were Okinawan or had an active case alleging
discrimination. (Id. at ¶ 21). Plaintiff's assertions,
however, do not show directly or circumstantially that
Defendants' reason for the shift change affecting four

34

employees was a prextext for Tomooka to retaliate against
Plaintiff. <u>France</u>, 795 F.3d at 1175. Plaintiff's statement
indicating that other similarly situated Supervisors of
Maintenance Operations were also subject to the shift change
disfavors finding pretext. <u>See</u> <u>Vasquez</u>, 349 F.3d at 641.

### 4. Absence Inquiry Letter

Plaintiff claims that Tomooka's act of sending a letter,
inquiring as the nature of Plaintiff's absence and requesting
additional supporting documentation, qualifies as an adverse
employment action.

An investigation of an employee engaged in protected
activity is, without more, insufficient to be an adverse
employment action. <u>Higdon v. Mabus</u>, 5 F.Supp.3d 1199, 1212
(S.D. Cal. 2014).

On August 1, 2014, the day before he was scheduled to
begin his temporary placement on the third shift, Plaintiff
informed Tomooka via e-mail that he was feeling ill. (Tomooka
Decl. at ¶ 27). Plaintiff left work on the same day and did
not return until June 29, 2015. (<u>Id.</u> at ¶¶ 24; 30).
Plaintiff provided some documentation of the reason behind his
leave to the Human Resources department, but he did not
provide that same information to Tomooka. (<u>Id.</u> at ¶ 28;

Arakaki Decl. at ¶ 28).

On August 19, 2014, eighteen days after Plaintiff left work, Tomooka sent an absence inquiry letter to him. (Tomooka Decl. at ¶ 28). The letter stated that pursuant to Postal Service employment procedures, Plaintiff must produce, within five days of receipt of the letter, "medical documentation or other acceptable evidence of incapacity to work." (Ex. D of Defs. CSF at p. 1, ECF No. 30-11). The letter advised Plaintiff of his rights pursuant to the Family and Medical Leave Act, 29 U.S.C. 2601, *et seq.*, and provided detailed instructions concerning the information that must be provided in cases of extended absences from work. (Id.)

While Tomooka's letter may have caused Plaintiff to seek additional supporting documentation from his physician, the added stress and inconvenience caused by Tomooka's letter is not a "materially adverse change in the terms and conditions of employment" that would qualify as adverse employment action. Ray, 217 F.3d at 1242 (quotations and citation omitted); Vaughn v. Donahoe, No. C 09-05746 SI, 2011 WL 2199245, at *11 (N.D. Cal. June 7, 2011) (holding that a warning letter requiring documentation validating her disability could not support a Title VII retaliation claim).

Plaintiff suffered no cognizable harm as a result of the

letter; Tomooka approved his extended absence after he
submitted additional documentation to her.


### 5. Denial of Promotion

On July 27, 2014, Plaintiff applied for a promotion to
become a Manager of Maintenance Operations.  (Arakaki Decl. at
¶ 25; Manager of Maintenance Operations job posting, Ex. E of
Defs. CSF, ECF no. 30-12).  A review board comprised of three
senior Postal Service employees, Daniel Hirai ("Hirai"), Risa
McDowell ("McDowell"), and Milton Kokubun ("Kokubun"),
analyzed Plaintiff's application and ranked him below the top
four applicants who were subsequently advanced to the next
step of the application process.  (Yonamine Decl. at ¶ 7, ECF
No. 30-3; Hirai Decl. at ¶ 9, ECF No. 30-4; Knowledge, Skills,
Abilities ("KSA") Matrix, Ex. F of Defs. CSF, ECF No. 30-13)).
Plaintiff was denied the promotion.

The Ninth Circuit Court of Appeals has recognized denial
of a promotion as an adverse employment action.  See Bergene
v. Salt River Project Agr. Imp. & Power Dist., 272 F.3d 1136,
1141 (9th Cir. 2001).

Plaintiff's claim based on the denial of his promotion
fails because he has not demonstrated a causal link between

his engagement in a protected activity and the denial of his promotion. Plaintiff has not presented evidence that the Postal Service review board that considered his application to become a Manager of Maintenance Operations knew of his protected activity when it denied the promotion. Gonzalez v. Nat'l R.R. Passenger Corp., 376 F. App'x 744, 747 (9th Cir. 2010) (knowledge of protected activity is required to establish causation in Title VII retaliation cases) (citing Raad, 323 F.3d at 1197); Brooks, 1 F.Supp.3d at 1037.

There is no evidence that the three members of the Postal Service's review board, Hirai, McDowell, and Kokubun, knew of Plaintiff's engagement in protected activity when they evaluated his application and forwarded their list of finalists. See Thomas, 379 F.3d at 812 n. 4; Raad, 323 F.3d at 1197. Hirai states, and Plaintiff does not dispute, that "whether the applicant had made a prior complaint to the Equal Employment Office is generally not known by the review board, and plays no role in this process." (Hirai Decl. at ¶ 10). McDowell and Kokubun specifically attested that they were not aware of Plaintiff's internal complaints during their tenure on the review board. (McDowell Decl. at ¶ 7, ECF No. 30-5; Kokubun Decl. at ¶ 7, ECF No. 30-6).

Plaintiff's declaration alleges that Hirai "made comments

to my co-workers that he heard from Tomooka that I was a trouble maker. I took that to mean because (sic) I filed EEO complaints as I had not (sic) performance issues." (Arakaki Decl. at ¶ 32). Notwithstanding the hearsay issues involved with Plaintiff's assertion, mere speculation, without more, cannot raise an issue of fact to defeat summary judgment. Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1060-61 (9th Cir. 2011) ("[t]o survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations"). Plaintiff has presented no admissible evidence establishing that the review board had actual knowledge of his protected activity when they evaluated his application. Cf. McDaniels v. Mobil Oil Corp., 527 F. App'x 615, 617 (9th Cir. 2013).

Even if Plaintiff was able to establish a prima facie case based on the denial of his application for a promotion, Defendants provided a legitimate, non-discriminatory reason for denying his promotion. Defendants state that Plaintiff was denied a promotion to the Manager of Maintenance Operations position because a review board objectively ranked Plaintiff's Knowledge, Skills, and Abilities score below that of competing applicants. (McDowell Decl. at ¶ 7; Kokubun Decl. at ¶ 7; Hirai Decl. at ¶¶ 6-9).

Plaintiff does not dispute Defendants' position that each application was scored objectively on the basis of the application materials. (Hirai Decl. at ¶ 10).

Plaintiff's speculation, without more, fails to establish pretext. <u>Cafasso, U.S. ex rel.</u>, 637 F.3d at 1060-61 ("[t]o survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations").

### 6.  Unavailable Desk and Missing Computer

Plaintiff complains that upon his return to work in June 2015, no desk was immediately available for him to use. Plaintiff also indicates that his regular work computer "disappeared." (Arakaki Decl. at ¶ 33).

Plaintiff's bare-bones allegations are insufficient to raise a genuine issue of material fact as to whether the unavailable desk and missing computer constituted an adverse employment action. Plaintiff was away from work for approximately 11 months. The vagueness of Plaintiff's declaration fails to indicate the context and severity of the issue. Plaintiff has failed to show that the desk and computer issues he faced upon his return from an extended leave of absence were anything more than "minor annoyances."

Burlington N. and Santa Fe Ry. Co., 548 U.S. at 68.

### 7.    One-Day Suspension

Plaintiff contends that sometime after his return to work in June 2015, Tomooka suspended him for one day without pay after he insisted on having a union representative serve as a witness for a meeting to discuss Plaintiff's work performance. Plaintiff states that his pay was reinstated after grieving the issue with his union.  (Arakaki Decl. at ¶ 34).

The United States Supreme Court has indicated that suspensions without pay may be considered adverse employment actions, even if the employee is reinstated with full backpay. See Burlington N. and Santa Fe Ry. Co., 548 U.S. at 73.

Plaintiff has failed to provide sufficient evidence concerning the causal link between Tomooka's alleged decision to suspend him for one day and his engagement in protected activity.

Plaintiff's only evidence to support a causal link is his own declaration.  Plaintiff's declaration states that on an undefined date sometime after he returned to work in June 2015, Tomooka suspended him for one day without pay.  (Arakaki Decl. at ¶ 34).  Even if read in the light most favorable to Plaintiff, the declaration does not connect the suspension to

Plaintiff's protected activity. "An unpleasant interaction with one's supervisor, even one that occurs after protected activity, is not necessarily actionable retaliation." <u>Ambat v. City & Cnty. of San Francisco</u>, No. C 07-03622 SI, 2010 WL 934006, at *5 (N.D. Cal. Mar. 15, 2010) (citing <u>Burlington N. and Santa Fe Ry. Co.</u>, 548 U.S. at 68). Plaintiff has not met the but-for causation standard required in Title VII retaliation cases. <u>Nassar</u>, 133 S.Ct. at 2533.

Plaintiff has not satisfied the <u>McDonnell Douglas</u> burden shifting framework for any of the seven alleged adverse employment actions. <u>See</u> <u>Davis</u>, 520 F.3d at 1089. Summary judgment is warranted as to his claims of unlawful retaliation pursuant to Title VII.

## CONCLUSION

Plaintiff Keith Y. Arakaki withdrew his claims of employment discrimination on the basis of race and sex pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et seq.*

Plaintiff failed to present evidence sufficient to defeat summary judgment as to his claims of unlawful retaliation pursuant to Title VII.

Defendants United States Postal Service and Postmaster General Megan J. Brennan's Amended Motion for Summary Judgment (ECF No. 29) is **GRANTED.**

IT IS SO ORDERED.

DATED: March 31, 2017, Honolulu, Hawaii.



_____
Helen Gillmor
United States District Judge

Keith Y. Arakaki v. Megan J. Brennan, Postmaster General; United States Postal Service, Civil No. 15-00229 HG-RLP; **ORDER GRANTING DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT (ECF NO. 29)**

43